# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARMEN KEMPF, INDIVIDUALLY and ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                  Plaintiff,<br><br>               v.<br><br>CORBUS PHARMACEUTICAL HOLDINGS, INC., YUVAL COHEN, AND SEAN MORAN,<br><br>                  Defendants. | Civil Action No. _____<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>Jury Trial Demanded |

Plaintiff Carmen Kempf ("Plaintiff"), by and through her attorneys, alleges upon personal knowledge as to herself, and upon information and belief as to all other matters, based upon the investigation conducted by and through her attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Corbus Pharmaceutical Holdings, Inc. ("Corbus" or the "Company") common stock between November 14, 2016 and February 28, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. Corbus purports to be a Phase 3 clinical-stage pharmaceutical company focused on the development and commercialization of novel therapeutics to treat inflammatory and fibrotic diseases.

3. During the Class Period, and unbeknownst to investors, Corbus made false and/or misleading statements and/or failed to disclose that Corbus' drug candidate, Lenabasum, had "failed its major trials in [systemic sclerosis] and [cystic fibrosis]."

## JURISDICTION AND VENUE

4. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

6. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b). Corbus is headquartered in this district, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

8. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ ("Nasdaq"), a national securities exchange.

## PARTIES

9. Plaintiff Carmen Kempf is an individual residing in Wasco County, in the State of Oregon. Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by Company's material misrepresentations and material omissions.

10. Defendant Corbus Pharmaceuticals Holdings, Inc., is incorporated in the State of Delaware and has its headquarters in Boston, Massachusetts. The Company's stock trades on the Nasdaq under the ticker symbol "CRBP".

11. Defendant Yuval Cohen ("Cohen") is, and was at all relevant times, Corbus' Chief Executive Officer.

12. Defendant Sean Moran ("Moran") is, and was at all relevant times, Corbus' Chief Financial Officer.

13. Collectively, Cohen, and Moran, are referred to throughout this complaint as the "Individual Defendants".

14. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being

made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

15. The Class Period begins on November 14, 2016 . On that day, Corbus issued a press release which was filed with the SEC on Form 8-K, signed by Defendant Cohen, and which stated in pertinent part:

> On November 14, 2016, the Company announced positive topline results from its Phase 2 study evaluating Resunab ("JBT-101") for the treatment of diffuse cutaneous systemic sclerosis ("systemic sclerosis"). JBT-101 out-performed placebo in the American College of Rheumatology (ACR) Combined Response Index in diffuse cutaneous Systemic Sclerosis (CRISS) score, reaching 33% at week 16, versus 0% for placebo. The higher the CRISS score the greater the improvement; a CRISS score $\geq$ 20% (CRISS20) can be considered a medically meaningful improvement. The difference in CRISS scores between JBT-101 and placebo groups over the trial period was significant ($p = 0.044$). Differences in categorical levels of CRISS responses and changes from baseline in the five individual domains of the CRISS score also supported clinical benefit of JBT-101.
>
> The multi-center, double-blind, randomized, placebo-controlled Phase 2 study evaluated JBT-101's clinical benefit and safety in 27 subjects who received JBT-101 and 15 who received placebo. Subjects had disease duration up to 6 years and were allowed to receive stable doses of immunosuppressive drugs during this study. Subjects were randomized (2 to 1 overall JBT-101 to placebo ratio) to receive JBT-101 for the first four weeks at 5 mg once a day ($n = 9$), 20 mg once a day ($n = 9$), or 20 mg twice a day ($n = 9$) or placebo for the first four weeks, then all JBT-101 subjects received 20 mg twice a day for the next 8 weeks. All subjects were followed off study drug from weeks 13 through 16.
>
> The primary efficacy objective was to evaluate clinical benefit in all subjects who received JBT-101 versus subjects who received placebo using the ACR CRISS score, a measure of improvement in systemic sclerosis. The CRISS is an exponentially weighted algorithm of change from baseline that includes the modified Rodnan skin score (mRSS), a measure of skin thickening, physician global assessment (MDGA), patient global assessment (PtGA), and Health Assessment Questionnaire - Disability Index (HAQ-DI), and forced vital capacity (FVC).

4

**Results:**

The median (25th percentile, 75th percentile) CRISS scores for the combined JBT-101 group and the placebo group at Weeks 4, 8, 12, and 16 are provided in the table below. The difference in CRISS scores between JBT-101 and placebo groups over the trial period was significant (p = 0.044), 1-sided mixed model repeated measures using rank transformed data.

| Group | Median CRISS Score[1], % (25th percentile, 75th percentile) | | | |
|---|---|---|---|---|
| | Week 4 | Week 8 | Week 12 | Week 16 |
| JBT-101 n = 26 | 3% (0.6%, 11.4%) | 19% (0.3%, 69.2%) | 27.5% (1.9%, 67.8%) | 33% (0.8%, 82.1%) |
| Placebo n = 15 | 1% (0.3%, 8.8%) | 1% (0.1%, 15.2%) | 1% (0.1%, 60.1%) | 0% (0.1%, 16%) |

1)       Modified intent to treat population, last observation carried forward

Results of secondary efficacy outcome measures supported the finding of clinical benefit of JBT-101, including numerical superiority of JBT-101 in each of the five domains of the CRISS score, with divergence starting early at Week 4 or Week 8.

There were no serious, severe, or unexpected adverse events related to JBT-101. One of 27 subjects (3.7% of subjects) who received JBT-101 withdrew from the study for an adverse event which was moderate dizziness.

The primary treatment period has been completed and subjects are now enrolled in a one- year open label extension to obtain data on long-term safety and durability of response. The Company received approval for an open-label extension to its Phase 2 clinical study of JBT-101 for systemic sclerosis from the U.S. Food and Drug Administration ("FDA") in April of 2016. The open-label extension enables all the participants in the study to receive JBT-101 for an additional 12 months.

16.      On March 30, 2017, Corbus issued a press release which was filed with the SEC on Form 8-K, and signed by Defendant Cohen, and which stated in pertinent part:

On March 30, 2017, the Company announced positive topline data from its Phase 2 study evaluating multiple doses of anabasum (fka JBT-101 or Resunab) compared to placebo for the treatment of patients with cystic fibrosis ("CF"). The 16-week study dosed 85 adult CF patients with baseline forced expiratory volume in 1 second (FEV1) percent predicted ≥ 40%, who were enrolled without regard to their specific CFTR mutation or infecting pathogens and continued with all baseline treatment regimens.

17. On November 8, 2017, Corbus filed its quarterly report for the third quarter of 2017 on Form 10-Q with the SEC, and which stated in pertinent part:

> In November 2016, we reported positive clinical data in a Phase 2 anabasum study for the treatment of systemic sclerosis. Following an end-of-Phase 2 meeting with the FDA, we submitted a protocol to the FDA on March 31, 2017 for a Phase 3 study in systemic sclerosis. We also received protocol assistance from the EMA on the Phase 3 study design. We expect to commence the Phase 3 study in systemic sclerosis in the fourth quarter of 2017.

18. Defendants Cohen and Moran signed certifications for the Form 10-Q referenced above. Among other things, this certification, which was made pursuant to the Sarbanes-Oxley Act of 2002, required the signer to attest that they have reviewed the report, that it does not contain untrue statements, that it fairly represents the financial condition of the company, and that the company's internal controls are effective.

19. The statements set out above in paragraphs 15 to 18 were materially false and misleading.

20. Corbus and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Corbus, their control over, and/or receipt and/or modification of Corbus' allegedly materially misleading statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Corbus, participated in the fraudulent scheme alleged herein.

21. On February 28, 2019, the truth was revealed when an article titled, "Corbus Has Ties to Suspect Investors And A History of Failed Clinical Trails for Lenabasum" (the "Corbus Article") was published on Seeking Alpha. The Corbus article stated in pertinent part:

> We believe Lenabasum failed every previous clinical trial
>
> Lenabasum (formerly known as anabasum, resunab, and JBT-101, among others) was first characterized as a CB2 specific agonist and having potential therapeutic promise in the late 1990's and early 2000's by Professor Sumner Burstein, who then licensed the product to a company called Atlantic Pharmaceutical. Preclinical data in animal models pointed to the drug having prospects as an analgesic (pain reliever), so Atlantic performed a single-site clinical trial in Germany that was published in 2003. Atlantic sublicensed it to Indevus which shelved it and eventually terminated its license deal in 2008, reverting rights all the way back to Sumner Burstein. We believe this is a strong indication that lenabasum likely failed to provide meaningful benefits in pain. Later Sumner Burstein licensed lenabasum to JB Therapeutics which decided to pursue an anti-inflammatory program with SSc as a lead indication.
>
> We believe the Phase 2 trial in SSc was a massive failure
>
> On November 2016, Corbus reported "positive" Phase 2 topline results, and later in November 2017 provided updated results at conferences. In its press release and presentation, Corbus highlighted the median CRISS scores for combined JBT-101 groups and placebo at weeks 4, 8, 12, and 16, and mentioned that the primary endpoint was safety and to "evaluate efficacy using the American College of Rheumatology Combined Response Index in diffuse cutaneous Systemic Sclerosis (CRISS) score" and that this was a "16-week study in diffuse cutaneous systemic sclerosis."
>
> However, according to clinicaltrials.gov at the time of the trial's initiation, enrollment, and top-line readout the primary efficacy endpoint was different – it was indicated as the "Change in Combined Response Index in diffuse cutaneous Systemic Sclerosis (CRISS) from baseline at Day 85," or 12 weeks.
>
> Corbus appears to have changed the primary efficacy endpoint of the study after the company was unblinded to the results, extending the efficacy readout to 16 weeks which was a full 4 weeks after patients were off therapy. We believe this is important because we would not expect therapeutic benefit relative to placebo to be maximized during a 4-week period of patients off drug.
>
> On the original clinicaltrials.gov page, the primary endpoint is clearly listed as Day 85. Well after the trial was unblinded, the clinicaltrials.gov page was changed to reflect the "new" efficacy endpoint almost 2 years after the trial results were reported by Corbus.

7

22. The Corbus Article further stated:

> Even if you want to analyze CRISS at the 16-week time point, it still failed when we adjust for Corbus' use of a one-sided test. Corbus reported a one-sided p value, not the traditional two-sided p value that is normally reported in clinical trials. In a one-sided test and assuming standard scientific and clinical practice (which the FDA does), statistical superiority is only achieved if $p<0.025$, not $p<0.05$.
>
> We want to note that the use of a one-sided statistical test is unusual, and investors may not understand the important distinction that p must be less than 0.025 in a one-sided test to reach statistical significance.
>
> Also in the footnote, it is mentioned that there was no effect for immunosuppressant therapy built into the CRISS model, which we believe is relevant because of a baseline imbalance of concomitant immunosuppressant therapy that favors the treatment arm over the placebo arm (93% vs. 80% of patients enrolled, see below for baseline comparison). In other words, we believe that if the model was adjusted to account for this immunosuppressant imbalance, then the difference between arms almost certainly becomes even smaller.
>
> In its Phase 3 trial for SSc, Corbus is ensuring no new or increased doses of immunosuppressive medications are given within 8 weeks prior to screening, in contrast to its Phase 2 trial which simply required stable SSc treatment for at least 28 days prior to visit 1 (which was at the time of screening since, since there was 28 days between screening and visit 1). Therefore, we think any "boost" from the immunosuppressant effect will be mitigated in the Phase 3, leaving only the placebo-like activity of lenabasum remaining.
>
> [Image Omitted]
>
> However, the CRISS score is not the primary endpoint in Corbus' ongoing pivotal Phase 3 trial in SSc. Instead, the trial's primary endpoint is the change from baseline in the mRSS (modified Rodnan skin score). We believe this data actually looks even worse.
>
> [Image Ommitted]
>
> First, we note that the change in mRSS score was not statistically significant with a p value of 0.085, which is a one-sided test that requires a p value of <0.025. Second, the data looks better at week 16 compared to week 12 largely due to what appears to be a placebo bump. We do not believe this is a robust efficacy signal.
>
> If we stay true to the 12 week efficacy time point originally recorded on clinicaltrials.gov, then it's clear to us that the trial failed. We believe Corbus used the 16 week placebo bump as a way to spin the data set and claim "success" since it was the only point in time that happened to even come close to separating from placebo.

Yet, even after this data spin, lenabasum still couldn't achieve statistical separation. Notably, Corbus is now running its Phase 3 out to 52 weeks. Even if the data for week 12 had been positive, we believe there would be additional risk of running a Phase 3 trial with a 52-week efficacy endpoint since we would have no information concerning the durability of the effect seen at 12 weeks.

23. The Corbus Article further stated:

We believe Corbus's additional secondary endpoint data in its Phase 2 SSc trial also failed

For HAQ-DI (Health Assessment Questionnaire Disability-Index), the differences between arms at 16 weeks (~0.2) is not statistically significant ($p<0.025$ for a one-sided test). Furthermore, the ~0.1 HAQ-DI difference from baseline to 16 weeks is much smaller than the difference between arms at baseline (0.4). Due to the small difference, we do not believe this to be clinically meaningful.

Similarly for FVC (lung function, forced vital capacity), we believe an FVC% improvement of 1% is not a clinically relevant change when baseline for lenabasum was 86%, and certainly did not come close to being statistically significant at any point in time from placebo.

[Image Omitted]

Changes from baseline for MDGA (physician assessment of global health) and PtGA (patient assessment of global health) also failed and did not separate from placebo except for one random time point at 8-weeks for MDGA. Given the lack of consistency in the data, we believe this is likely due to random chance.

[Image Omitted]

Lenabasum failed its Phase 2 in SSc despite clearly enrolling healthier patients

Bulls might point to the directional advantage ("totality of data"/CRISS measurement) lenabasum has over placebo in these data as an indicator of drug activity. We think a healthier patient population recruited in the lenabasum arm and/or a concomitant immunosuppressant imbalance are the more likely explanations.

When considering baseline characteristics of the lenabasum and placebo populations, we find that every single measure of disease activity (disease duration, HAQ-DI, FVC%, MDGA, PtGA, and Modified Rodnan skin score) favors the lenabasum arm over the placebo arm at baseline. In other words, drug patients were healthier, on average, coming into the Phase 2 trial. Though not statistically significantly different for any single measure (mostly due to the trial's very small sample size), we believe the fact that every measure numerically favored the lenabasum arm (and in the case for some metrics like

9

> HAQ-DI, was almost 50% higher [worse] in the placebo arm than the lenabasum arm) is compelling evidence to conclude that these populations were not balanced.
>
> [image omitted]
>
> To us, this indicates that there was a healthier, more resilient patient population that was randomized into the drug arm relative to the placebo arm. We believe this is particularly relevant in a trial investigating SSc, an extensive and progressive fibrotic disease, in which more severe patients at baseline may have a muted placebo response compared to healthier patients.
>
> Furthermore, a greater number of lenabasum patients were receiving concomitant immuno-modulating drugs than placebo patients which, when considering the tiny numerical differences seen in this trial between the pooled drug arms and placebo, could easily explain this trend as well. As a reminder, immunosuppressant use was not adjusted for in the CRISS model.
>
> Lenabasum showed no dose response in its failed Phase 2 in SSc
>
> We also believe lenabasum showed no dose response in its Phase 2 trial in SSc, which is typically a red flag. 1) The dose schedule tested a wide range of doses in weeks 1-4, but Corbus didn't split out these cohorts in its efficacy endpoint analysis and instead pooled all arms during weeks 1-4. We believe if there had been a convincing effect, Corbus would have shown it or been interested in running different doses the entire length of the treatment phase and; 2) After all patients were switched to 20 mg twice daily, there seems to be no difference in the trajectory of drug benefit in any of the outcome measures compared to weeks 1-4. We believe that a drug that does not demonstrate an impact on efficacy when increasing dose from 5 mg daily to 40 mg daily (8x the minimum tested dose) is likely doing nothing at all.

24. As the Corbus Article reveals, throughout the Class Period, Corbus made false and/or misleading statements with respect to Lenabasum. With respect to the false and misleading statements set out at paragraphs 15 to 18, above, Corbus changed the primary efficacy endpoint of the Lenabasum study after the Company was unblinded to the results, extending the efficacy readout to 16 weeks which was a full 4 weeks after patients were off the theraby. Initially, the clinicaltrails.gov page listed the primary endpoint as Day 85, but after the study was unblinded, the clinical endpoint was changed to Day 85 and 113. Moreover, Corbus reported a one-sided p value, not the traditional two-sided p value that is normally reported in

10

clinical trials, in order to conceal the fact that the study results did not have statistical significance. The Corbus article also reveals that the patients who received Lenabasum were healthier on average than those who received the placebo, coming into the Phase 2 trial. Thus, given that SSC is "an extensive and progressive fibrotic disease", patients who were placed into the placebo arm had a muted placebo response compared to healthier patients.

25. Following the release of the Corbus Article, the Company's common stock declined, closing down almost 16%, to close at $6.94 per share on February 28, 2019

## CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Corbus common stock between November 14, 2016 and February 28, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

27. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. More than 62 million Corbus shares trade on the Nasdaq.

28. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether the Exchange Act was violated by Defendants;

    b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of the Company's stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

29. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

30. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

31. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

32. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b. The omissions and misrepresentations were material;

   c. The Company's common stock traded in efficient markets;

   d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

33. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

34. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

35. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

36. During the Class Period, the price of Corbus' common stock declined significantly, closing down more than $1.32 per share, or nearly 16%, to close at $6.94 per share following the release of the Corbus Article on February 28, 2019.

## CAUSES OF ACTION

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

37. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

38. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

40. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### Count II
### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

41. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

42. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b) awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c) awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d) awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: March 12, 2019

Respectfully submitted,

*/s/ Jeffrey C. Block, Esq.*
**BLOCK & LEVITON LLP**
Jeffrey C. Block, jeff@blockesq.com
Jacob A. Walker, jake@blockesq.com
Nate Silver, nate@blockesq.com
155 Federal Street, Suite 400
Boston, Massachusetts 02110
(617) 398-5600 phone
(617) 507-6020 fax